**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**NICHOLAS COLARDO, individually**
**and as power of attorney for Daniel**
**Colardo and Matthew Colardo,**

    **Plaintiff,**

**v.**              **Case No. 8:10-cv-1615-T-30TBM**

**METROPOLITAN LIFE INSURANCE**
**COMPANY and BEM SERVICES, INC.,**

    **Defendants.**
_____/

## <u>REPORT AND RECOMMENDATION</u>

   THIS MATTER is before the court on referral by the Honorable James S. Moody for

a Report and Recommendation on **Defendant BEM Services, Inc.'s Motion for Judgment**

**on the Record** (Doc. 24), **Defendant Metropolitan Life Insurance Company's Motion for**

**Final Judgment** (Doc. 26), and **Plaintiff's Amended Motion for Judgment on the Record**

(Doc. 27).  Defendants have filed the administrative record (Doc. 20-1), the 2004 Summary

Plan Document (Doc. 21-1), and the 2006 Summary Plan Document (Doc. 20-2).  As set forth

below, I recommend that Defendants' motions (Docs. 24, 26) be granted and Plaintiff's

motion (Doc. 27) be denied.

I.

A.

   The essential facts are undisputed.  The late Christine R. Colardo was employed at

Williams Advanced Materials, Inc., a subsidiary of Defendant BEM Services, Inc. ("BEM").

At the time of her death, Ms. Colardo was covered under an employee benefit plan ("the Plan") that provided term life insurance and accidental death and dismemberment insurance to eligible employees.  The Plan was sponsored by BEM and is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq.  The life insurance benefits were funded through a group policy issued by Metropolitan Life Insurance Company ("MetLife").  The Plan delegated claims administration to MetLife and provided it with the discretionary authority to interpret the terms of the Plan and to determine eligibility for, and entitlement to, Plan benefits in accordance with the terms of the Plan.  (Docs. 21-1 at 73-77; 20-2 at 73-77).  The Plan included a Basic Life Insurance option with a maximum benefit of $40,000.00 and Optional Life Insurance for up to five times the employee's Basic Annual Earnings.  (Docs. 21-1 at 20-21; 20-2 at 20-21).

By reason of her years of employment, Ms. Colardo was eligible for insurance benefits under the Plan on January 1, 2004.  (Doc. 21-1 at 34).  For that year, she elected only the Basic Life Insurance coverage with the maximum benefit of $40,000.00.  After the initial enrollment period, BEM offered annual enrollment periods.  Ms. Colardo did not change her coverage for the benefit year 2005.  (Doc. 20-1 at 22).  For the benefit year beginning January 2006, Ms. Colardo elected the Optional Life Insurance benefit for two times her Basic Annual Earnings.  (Doc. 20-1 at 23).  The following year, she elected the Optional Life Insurance for three times her Basic Annual Earnings.[1]  (Doc. 20-1 at 27).  On November 7, 2006, BEM

_____

[1]These elections for optional coverage were not accompanied by evidence of Ms. Colardo's insurability.  Later, during the claims review process and in response to an inquiry from MetLife, BEM acknowledged that it had not requested the same from her.  (Doc. 20-1 at 67).

2

provided to Ms. Colardo a confirmation of her 2007 Flexible Benefits Elections that reflected her election of Basic Life Insurance and her election to receive Optional Life Insurance in the amount of three times her Basic Annual Earnings.  (Doc. 20-1 at 58).  It appears that after each election for Optional Life Insurance, BEM made the applicable payroll deductions from Ms. Colardo's pay.  *See e.g.* (Doc. 20-1 at 59-60).

Ms. Colardo died of lung cancer on November 5, 2007.  (Doc. 20-1 at 6).  The beneficiaries, Nicholas, Daniel, and Matthew Colardo, submitted claims for the life insurance benefits.  (Doc. 20-1 at 2-10).  MetLife approved and paid the Basic Life Insurance benefit of $40,000.00, but denied the claim for the additional $122,900.00 in Optional Life Insurance benefits because Ms. Colardo had not submitted evidence of insurability.  (Doc. 20-1 at 42-43, 45-46, 48-49).  In pertinent part, the denial letters stated:

> In order for late enrollees to apply for Optional Insurance exceeding three (3) times the employees' Base Annual Salary, the employee would have to complete and submit a Statement of Health application demonstrating Medical Evidence of Insurability . . . .  MetLife has no record of the participant completing the necessary application and no approval for Optional Group coverage was issued. Therefore, we must deny your claim for Optional Group Life benefits.

*Id.*  The beneficiaries, through counsel, challenged the denial on grounds that Ms. Colardo's pay stubs revealed that premiums for the Optional Life Insurance were deducted from her pay. (Doc. 20-1 at 57, 59-61).  On or about July 7, 2008, MetLife upheld its decision to deny the claim for Optional Life Insurance benefits.  (Doc. 20-1 at 68-69).  In pertinent part, MetLife stated:

3

The plan states that employees who enroll for Optional Life Insurance during the first annual enrollment period following the date you became eligible, medical evidence of insurability (Statement of Health) is not required.  However, if you make a late request Optional Life Insurance (more than 31 days after you become eligible), medical evidence of insurability is required.

According to our records, Christine Colardo was eligible to elect Optional Life insurance on January 1, 2004.  However, Ms. Colardo chose to waive the Optional Life Insurance benefits at that time.  On January 1, 2006, Ms. Colardo had elected two (2) times her base annual earnings for Optional Life coverage.  However, she did not complete a Statement of Health to determine eligibility for this coverage.  You believe the initial determination was wrong because the employer was collecting premiums for this coverage through payroll deductions.  As the employer maintains the records for their employees, MetLife determines eligibility at the time of passing when the records are forwarded to our office for review to determine payment of coverage.  Please be advised that the premiums paid for coverage that is not payable is subject to premium reimbursement.

*Id.*

### B.

The 2004 Summary Plan Description ("SPD") was the applicable Plan document when Optional Life Insurance benefits were first offered to Ms. Colardo for the benefit year 2004.  *See* (Doc. 21-1).  The 2004 SPD was also the applicable Plan document when she elected Optional Life Insurance coverage at two times her Basic Annual Earnings for the benefit year beginning in January 2006.  *Id.*  The 2006 SPD (Doc. 20-2) was the applicable Plan document when Ms. Colardo elected Optional Life Insurance coverage at three times her Basic Annual Earnings for the benefit year beginning January 2007.

4

On the matter of enrollment, both the 2004 SPD and the 2006 SPD provided in pertinent part:

**ENROLLMENT PROCESS**

If You are eligible for insurance, You may enroll for such insurance by completing the required form.  In addition, You must give evidence of Your Insurability satisfactory to Us at Your expense if You are required to do so under the section entitled EVIDENCE OF INSURABILITY.  If You enroll for Contributory Insurance, You must also give the Policyholder Written permission to deduct premiums from Your pay for such insurance.  You will be notified by the Policyholder how much You will be required to contribute.  The insurance listed below is part of a flexible benefits plan established by the Policyholder.  Subject to the rules of the flexible benefits plan and the Group Policy, You may enroll for:

Life Insurance For You;

. . .

only when You are first eligible or during an annual enrollment period or if You have a Qualifying Event.  You should contact the Policyholder for more information regarding the flexible benefits plan.[2]

**DATE YOUR INSURANCE THAT IS PART OF THE FLEXIBLE BENEFITS PLAN TAKES EFFECT**

**Enrollment When First Eligible**

If You complete the enrollment process within 31 days of becoming eligible for insurance, such insurance will take effect as follows:
• if You are **not required** to give evidence of Your insurability, such insurance will take effect on the date You become eligible for such insurance if You are Actively at Work on that date.

. . .

• if You are **required** to give evidence of Your insurability and We determine that You are Insurable, the benefit will take effect on the date We state in Writing, provided You are Actively at Work on that date.

. . .

---

[2]Under the Plan, "We," "Us," and "Our" means MetLife.  "You" and "Your" means the covered employee.  (Docs. 21-1 at 30, 20-2 at 30).

> If You do not complete the enrollment process within 31 days of becoming eligible, You will not be able to enroll for insurance until the next annual enrollment period, as determined by the Policyholder, following the date You first became eligible.  At that time You will be able to enroll for insurance for which You are then eligible.

(Docs. 21-1 at 35; 20-2 at 35).  This provision was followed in the Plan with a provision specifically addressing enrollment during the first annual enrollment period following the date the employee became eligible (Docs. 21-1 at 36, 20-2 at 36).  It next prescribed the following for any subsequent annual enrollment period:

> **Enrollment During Any Subsequent Annual Enrollment Period**
>
> During any annual enrollment period **as determined by the Policyholder**, You may enroll for insurance for which You are eligible or choose a different option than the one for which You are currently enrolled.  The insurance enrolled for or changes to Your insurance made during an annual enrollment period will take effect as follows:
>
> for any amount for which You are **not required** to give evidence of Your insurability, such insurance will take effect on the first day of the calendar year following the annual enrollment period, if You are Actively at Work on that day. . . .
>
> for any amount for which You are **required** to give evidence of Your insurability and We determine that You are insurable, such insurance will take effect on the date We state in Writing, if You are Actively at Work on that date.  . . .

(Docs. 21-1 at 37; 20-2 at 37)

On the matter of evidence of insurability, both the 2004 SPD and the 2006 SPD provided in pertinent part:

> **EVIDENCE OF INSURABILITY**

6

We require evidence of insurability satisfactory to Us as follows:

. . .

2.  if You make a request during an annual enrollment period to increase the amount of Your Optional Life Insurance to an option which is more than one level **above** Your current amount of Optional Life Insurance.

If You do not give Us evidence of insurability or the evidence of insurability is not accepted by Us as satisfactory, the amount of Your Optional Life Insurance will not be increased.

. . .

6.  if You make a late request for Optional Life Insurance.  A late request is one made more than 31 days after You become eligible.

If You do not give Us evidence of insurability or the evidence of insurability is not accepted by Us as satisfactory, You will not be covered for Optional Life Insurance.

. . .

The evidence of insurability is to be given at Your expense.

(Docs. 21-1 at 46; 20-2 at 46 ).

## II.

By his Complaint, Plaintiff sues BEM and MetLife for the wrongful denial of Optional

Life Insurance benefits, pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C.

§ 1132(a)(1)(B).  By his motion, Plaintiff argues that the denial of these benefits was arbitrary

and capricious.  Plaintiff predicates his argument on the contention that both BEM and

MetLife are ERISA fiduciaries who owed Plan participants an unwavering duty of loyalty,

care, and diligence, and that both breached such duty.  While not disputing that Ms. Colardo

never provided any evidence of insurability along with her elections of Optional Life

Insurance, Plaintiff urges that MetLife nonetheless wrongly denied the claim for such benefits

because (1) BEM failed to recognize the necessity for her to provide evidence of insurability

and to request that she provide such evidence, (2) BEM confirmed her 2007 Flexible Benefits elections and made the appropriate payroll deductions from her wages for the cost of such optional coverage, and (3) both BEM and MetLife, as fiduciaries, failed to take any steps to correct their mistakes in order to effectuate her benefit elections.[3]  In sum, Plaintiff contends that as fiduciaries, Defendants were responsible for managing the Plan for the benefit of the participants, understanding the forms necessary to effectuate an election of benefits, and ensuring that those forms were provided to the participants.  Twice they failed to assist Ms. Colardo in effectuating her application for Optional Life Insurance benefits and collected the premiums for such coverage from her pay.  As a consequence, Plaintiff urges that MetLife's denial of benefits was arbitrary and capricious.  (Doc. 27).

Defendant BEM initially notes that the Complaint states a claim for the denial of benefits under Section 502(a)(1) of ERISA and not a claim for breach of fiduciary duty under section 502(a)(3).  In the given circumstances, BEM contends the law does not allow Plaintiff a remedy under this latter catch-all provision.  In any event, BEM urges that judgment in its favor is appropriate because under the terms of both SPDs, MetLife is the sole entity required to pay benefits and thus the benefits claim does not lie against BEM.  It urges further that the decision to deny benefits was the correct decision because the terms of the SPDs unambiguously required participants to submit evidence of insurability as a condition

---

[3]Plaintiff also contends that the initial denial by MetLife was based on factual errors in that Ms. Colardo was not a "late enrollee" and she had not sought coverage "exceeding three (3) times [her] Base Annual salary" as asserted in the denial letter.  To the extent the initial denial appears predicated in part on the conclusion that Ms. Colardo had sought coverage "exceeding three (3) times [her] Base Annual salary," such was factually incorrect.  However, this assumption played no part in the later decision affirming the decision to deny benefits.

precedent to receiving Optional Life Insurance in these circumstances. Here, where Ms. Colardo sought to add Optional Life Insurance at two times and then three times her Basic Annual Earnings, BEM urges that her failure to submit evidence of insurability justified MetLife's denial. (Doc. 24).

Defendant MetLife argues that judgment on the record is appropriate because its decisions to deny the claim for Optional Life Insurance and Plaintiff's appeal were right, reasonable, and supported by the administrative record. MetLife asserts that the relevant SPDs, which were made available to Ms. Colardo, unambiguously required "late enrollees" to submit evidence of insurability, and because she did not submit such evidence, she was never approved for, or enrolled in, Optional Life Insurance coverage.[4]  MetLife maintains that because Ms. Colardo did not request Optional Life Insurance during the first thirty-one days of eligibility and instead waited nearly two years before electing such coverage, she was a "late enrollee" in contemplation of the Plan and thus required to provide evidence of insurability under both SPDs. MetLife also asserts that principles of equitable estoppel and waiver do not apply to Plaintiff's ERISA claim where the requirements of the Plan are not ambiguous. As does BEM, it urges that neither it nor BEM was under any obligation to ensure that Ms.

---

[4]MetLife also notes that any attempt to increase Optional Life Insurance during an annual enrollment period by more than one level over current levels requires evidence of insurability under the Plan. Thus, "[Ms. Colardo's] January 2006 initial attempt to elect Optional Life Insurance coverage and her January 2007 attempt to increase that coverage over a 'current' amount both fail. Having waived Optional Life Insurance coverage in January 2004, [Ms. Colardo] had no 'current' amount that could be increased by one level without evidence of insurability in 2006 and 2007, when she attempted to enroll in, respectively, two and then three times her basic annual earnings." (Doc. 26 at 14 n.11).

Colardo submitted evidence of insurability or to take corrective action as urged by the Plaintiff.  (Doc. 26).

In response, Plaintiff first urges that under the enrollment provisions of the Plan, Ms. Colardo was not a "late enrollee" required to submit evidence of insurability.  By his reading of the Plan, the fact that Ms. Colardo did not elect Optional Life Insurance coverage within thirty-one days of her initial period of eligibility was not significant because her later elections were timely made during annual enrollment periods.  Thus, because Ms. Colardo made her initial election of Optional Life Insurance at two times her Basic Annual Earnings within thirty-one days of the beginning of a subsequent annual enrollment period, Plaintiff urges that she was not required to provide proof of insurability.  Plaintiff also urges that when Ms. Colardo added only one additional level of optional coverage the following year, the Plan again did not call for such evidence.  Plaintiff reiterates that Defendants breached their fiduciary duty to assist Ms. Colardo in effectuating her benefit election and by not correcting her circumstances to permit such benefits.  Furthermore, given the circumstances where BEM provided Ms. Colardo with confirmation of her 2007 election of benefits and collected premiums for the optional coverage for two years, Plaintiff argues that Defendants are equitably estopped from denying benefits or have otherwise waived the requirement of evidence of insurability by accepting the premiums.  (Docs. 30, 32).

III.

A.

Because the Plan delegates to MetLife the discretionary authority to determine benefit claims and appeals, the arbitrary and capricious standard of review governs this court's

review.  The parties have filed a stipulation to this effect.  (Doc. 18).  Thus, they agree that the

court's review is limited to the administrative record and that the matter is appropriately

decided on their cross-motions.  *See id.*

When reviewing an ERISA benefits denial under an arbitrary and capricious standard,

"the function of the court is to determine whether there was a reasonable basis for the

decision, based on the facts as known to the administrator at the time the decision was made."

*Glazer v. Reliance Standard Life Ins. Co.,* 524 F.3d 1241, 1246 (11th Cir. 2008) (quoting *Jett*

*v. Blue Cross & Blue Shield of Ala.,* 890 F.2d 1137, 1139 (11th Cir. 1989)).  The Eleventh

Circuit has prescribed the following sequential standard of review in ERISA cases:

> (1) Apply the *de novo* standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" (i.e., the
> court disagrees with the administrator's decision); if it is not,
> then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is *"de novo* wrong,"
> then determine whether he was vested with discretion in
> reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is *"de novo* wrong" and he
> was vested with discretion in reviewing claims, then determine
> whether "reasonable" grounds supported it (hence, review his
> decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and
> reverse the administrator's decision; if reasonable grounds do
> exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the
> decision.
>
> (6) If there is a conflict of interest, then apply heightened
> arbitrary and capricious review to the decision to affirm or deny it.

*Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189, 1195 (11th Cir. 2010) (citation omitted).  As

recognized in *Capone*, although this six-step methodology remains intact, the heightened

arbitrary and capricious review called for at step six was implicitly overruled in *Metropolitan*

*Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).  Now, while an ERISA plan administrator

operates under a conflict of interest when it both determines eligibility for benefits and pays

those benefits, the existence of a conflict of interest is merely a factor for the district court to

take into account when determining whether the administrator's decision was arbitrary and

capricious.  *Capone,* 592 F.3d at 1195-96 (citing *Doyle v. Liberty Life Assurance Co. of*

*Boston,* 542 F.3d 1352, 1360 (11th Cir. 2008)).  Throughout, the burden remains on the

plaintiff to show the decision was arbitrary.  *Id.* at 1196.

B.

Here, upon a *de novo* review of the administrative record, I conclude that the decision

to deny Optional Life Insurance benefits was the correct decision under the terms of the Plan.

I conclude further that equitable estoppel is not a remedy available to Plaintiff.

It is worth reiterating that Plaintiff brings his claim for denial of benefits under Section

502(a)(1) of ERISA, 29 U.S.C. § 1132(a)(1)(B).[5]  This provision permits beneficiaries and

participants to bring a civil action "to recover benefits due to him under the terms of his plan,

---

[5]To the extent that BEM suggests that it is not a proper party to a benefits claim, it is incorrect.  In an action concerning ERISA benefits brought under § 502(a)(1)(B), "the proper party defendant is the party that controls the administration of the plan."  *Garden v. John Hancock Mut. Life Ins. Co.,* 114 F.3d 186, 187 (11th Cir. 1997).  When an employer is acting as the administrator, it can be held liable for ERISA violations, regardless of whether the plan designates the employer as the administrator.  *Hamilton v. Allen-Bradley Co.,* 244 F.3d 819, 824 (11th Cir. 2001); *Rosen v. TRY, Inc.,* 979 F.2d 191, 193-94 (11th Cir. 1992).

12

to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *Katz v. Comprehensive Plan of Group Ins.,* 197 F.3d 1084, 1089 (11th Cir. 1999).  In addition to the remedies explicitly authorized by Section 502(a)(1)(B), "which are akin to common law breach of contract causes of action, [the Eleventh Circuit] has recognized a very narrow common law doctrine under Section 502(a)(1)(B) for equitable estoppel, which is available where the plaintiff can show that (1) the relevant provisions of the plan at issue are ambiguous, and (2) the plan provider or administrator has made representations to the plaintiff that constitute an informal interpretation of the ambiguity."  *Jones v. Am. Gen. Life & Acc. Ins. Co.,* 370 F.3d 1065, 1069 (11th Cir. 2004).  The remedy is a limited one and not available to plaintiffs "in cases involving oral amendments to or modifications of employee plans governed by ERISA . . ." *Kane v. Aetna Life Ins.,* 893 F.2d 1283, 1285 (11th Cir. 1990) (citing *Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir. 1986)).

Here, equitable estoppel is not available to Plaintiff.  Even if it is assumed that the provisions of the Plan requiring evidence of insurability and for enrollment are ambiguous, this is not a case in which the plan administrator has made representations to the participant that constitute an informal interpretation of the ambiguity.  The only representation as such was made by BEM through a form used by Ms. Colardo to confirm her benefit elections for 2007.  While Ms. Colardo may well have relied on this confirmation form and the fact that premiums were deducted by BEM from her pay, those circumstances alone are not enough to invoke this remedy.  Stated otherwise, this is not a case where the employee relied, "to [her] detriment, on an interpretation of an ambiguous provision in a plan by a representative of that

plan." *See Nat'l Cos. Health Benefit Plan v. St Joseph's Hosp. of Atlanta, Inc.,* 929 F.2d 1558, 1571-72 (11th Cir. 1991) (citing *Kane*, 893 F.2d at 1286), *abrogated on other grounds by Geissal v. Moore Med. Corp.*, 524 U.S. 74 (1998)); *see also Alday v. Container Corp. of Am.,* 906 F.2d 660, 666 (11th Cir. 1990) ("First, *Kane* only comes into play when the terms of a plan are ambiguous.  In addition, equitable estoppel may only be used where the communications constituted an interpretation of that ambiguity.").  No such communications by a Plan representative are demonstrated on this record and this remedy is unavailable to Plaintiff as a basis for awarding her benefits.

As for MetLife's decision to deny benefits, the decision is "wrong" if the court, upon *de novo* review, disagrees with the claims administrator's plan interpretation or decision.  *See Williams v. BellSouth Telecomms., Inc.,* 373 F.3d 1132, 1138 (11th Cir. 2004) (citing *Brown v. Blue Cross and Blue Shield of Ala., Inc.,* 898 F.2d 1556, 1566 n.12 (11th Cir. 1990)).  Here, upon my consideration of the administrative record, to the extent that MetLife determined that the claim for Optional Life Insurance benefits should be denied because Ms. Colardo was a late enrollee when she sought to obtain two times her base annual earnings and she failed to provide evidence of insurability as required, the decision is correct.

As set forth above, the Plan unequivocally requires a participant who makes a late request for Optional Life Insurance benefits to submit evidence of insurability to MetLife.  Similarly, such evidence is required when, during an annual enrollment period, the employee requests to increase her Optional Life Insurance by more than one level above her then current level for such coverage.  *See* supra at 6-7.  A late request is one made more than thirty-one days after the participant became eligible.  Here, Ms. Colardo became eligible for benefits on

14

January 1, 2004.  At that time, Ms. Colardo elected only the Basic Life Insurance benefit for $40,000.00.  She did not elect Optional Life Insurance benefits until the annual enrollment period for the January 2006 benefits year, at which time she elected the option for two times her Basic Annual Earnings.  Because Ms. Colardo first elected Optional Life Insurance benefits more than thirty-one days after she became eligible for benefits, she was a late enrollee under the terms of the Plan and was required to submit evidence of insurability.  It is undisputed that Ms. Colardo did not submit evidence of insurability at that time.  It is also undisputed that she did not submit evidence of insurability the following year when she elected three times her basic earnings.  As set forth in the Plan, in these circumstances, there is no coverage for Optional Life Insurance in the absence of evidence of insurability.  Thus, the decision to deny benefits was correct.

While Plaintiff urges ambiguity and MetLife's incorrect reading of the enrollment provisions of the Plan to support his argument, his reading is strained at best and ignores the plain language of the related provisions.[6]  To the extent that Plaintiff argues that the decision

---

[6]Plaintiff's argument ignores the plain language related to late enrollment and is particularly strained to the extent that he urges Ms. Colardo was not obligated to submit evidence of insurabiltiy along with her request for two times (and the following year, three times) her Basic Annual Earnings because she made her election timely during an annual enrollment period.  As set forth above, the Plan expressly states that evidence of insurability is required "if You make a request during an annual enrollment period to increase the amount of Your Optional Life Insurance to an option which is more than one level above Your current amount . . ."  *See* supra at 7.  As the record indicates, when she first elected this optional coverage for the benefit year 2006, Ms. Colardo had no such "current" coverage at all and clearly was obliged to provide evidence of insurability by this provision as well as the late enrollee provision.  Contrary to Plaintiff's reading of the pertinent provisions, the fact that Ms. Colardo acted timely within an annual enrollment period did not nullify her responsibility to provide evidence of insurability.

is wrong because it penalizes Ms. Colardo for the Defendants' failure to perform as fiduciaries, he offers no legal support for such contention.  Such neglect by Defendants as is demonstrated on this record does not alter the plain terms of the Plan, which placed the burden for providing such evidence of insurability on the employee, and the failure of Defendants to request such evidence does not alter the correctness of the decision.[7]  Thus, assuming that Defendants did not waive the insurability provisions of the Plan, MetLife's decision is appropriately affirmed.

## C.

Plaintiff argues in his response that MetLife waived the insurability requirements as evidenced by BEM providing Ms. Colardo a confirmation of her 2007 benefits elections for the Basic Life Insurance and Optional Life Insurance for three times her Basic Annual Earnings and by deducting premiums from her pay for a period of nearly two years. According to Plaintiff, MetLife knew what was occurring yet at no time did it question the appropriateness of, or reject, the premium payments.  As his basis for urging that MetLife knew of the circumstances, Plaintiff contends that insurance companies such as MetLife, in the usual course of business, would have been expected to conduct an audit of the Plan records at least once during this period of time to assure that participants were paying premiums consistent with their elected coverages.  Thus, by accepting the premium payments,

---

[7]BEM administered the Plan from a fiduciary position and its apparent neglect in assuring a process for effectuating its employees' election of benefits is highly regrettable.  As this Plan was administered, MetLife could receive premiums for an indeterminate period of time without actually accepting any risk.  Such hardly seems consistent with the goals of ERISA and the obligations of its fiduciaries.  Some changes in the processes and administration of this Plan are in order.

Plaintiff contends that MetLife, either intentionally or tacitly, evidenced its waiver of the requirement for evidence of insurability.  Unfortunately for Plaintiff, such contention finds no support in the administrative record.

"Waiver is the voluntary, intentional relinquishment of a known right."  *Glass v. United of Omaha Life Ins. Co.,* 33 F.3d 1341, 1347 (11th Cir. 1994) (citing *Pitts v. Am. Sec. Life Ins. Co.,* 931 F.2d 351, 355 (5th Cir. 1991), and Appleman, Insurance Law and Practice § 9251 488-89 (1981)).  In *Glass,* the Eleventh Circuit rejected the plaintiff's waiver argument because he had not adduced sufficient evidence of either intentional relinquishment of a known right or of any unjust benefit circumstance. *Id.* at 1348.  The Court also, in following the lead of the Seventh Circuit, left open the question of whether in other circumstances waiver principles might apply under the federal common law in the ERISA context.[8]  It thus remains unclear whether principles of waiver form a part of the federal common law in the ERISA context and if so, its contours.

In this case, Plaintiff's claim of waiver fails because the record does not establish a voluntary, intentional relinquishment of the requirement for evidence of insurability as a

---

[8]The Court cited with approval *Thomason v. Aetna Life Insurance Co.,* 9 F.3d 645 (7th Cir. 1993).  In that case, the Seventh Circuit recognized that the requisites to finding a valid waiver were not as well established as the requisites for finding an equitable estoppel. *Id.* at 648.  It also recognized that while some courts require that the waiving party has received consideration for the waiver or that the non-waiving party has acted in reasonable reliance on the apparent waiver, other courts hold that an implicit waiver can be found without any detrimental reliance or exchange of consideration. *Id.* Given the facts then before it, the court declined to find waiver from what it described as a "something for nothing" kind of waiver where the insured sought to hold the insurer to it misrepresentations for no reasons other than such were made. *Id.* at 647-49.  The Eleventh Circuit in *Glass* agreed with this approach, which appears to require some form of reliance or exchange of consideration or an unjust benefit as part of the waiver analysis.

17

predicate to Ms. Colardo obtaining Optional Life Insurance under the Plan.  For all this record reveals, the requirements for evidence of insurability, while clearly set forth in the Plan, were never expressly addressed with Ms. Colardo by either Defendant.  And, despite BEM's post-death acknowledgment that it should have asked for the evidence, the lack of such evidence of insurability was not discovered by either Defendant until after Ms. Colardo's death.  Here, Plaintiff urges that the confirmation of benefits for 2007, coupled with the deduction of premiums from Ms. Colardo's pay, evidences sufficient waiver by MetLife to warrant the award of benefits.  However, the record evidence, such as it is, indicates that MetLife was unaware of both Ms. Colardo's election of Optional Life Insurance and the fact that BEM was collecting and paying premiums on her elections until it undertook to address the beneficiaries' claim for such benefits upon her death.  Undoubtedly, the collection of premiums in these circumstances was unjust to Ms. Colardo, and as noted above, Defendants' neglect regrettable.  However, absent some additional showing that MetLife acted knowingly and intentionally to allow for coverage regardless of the requirements for evidence of insurability, the waiver argument must fail.  *See Glass,* 33 F.3d at 1348; *Gagliano v. Reliance Standard Life Ins. Co.,* 547 F.3d 230, 239 (4th Cir. 2008); *Juliano v. Health Maint. Org. of N.J., Inc.,* 221 F.3d 279, 288 (2d Cir. 2000); *Thomason,* 9 F.3d at 647-48 (7th Cir. 1993); *see also Pitts*, 931 F.2d at 357.  While it is a harsh result, it here appears that Plaintiff's sole remedy is a refund of the premiums paid by Ms. Colardo.

IV.

For the foregoing reasons, I recommend that **Defendant BEM Services, Inc.'s Motion for Judgment on the Record** (Doc. 24) and **Defendant Metropolitan Life**

18

**Insurance Company's Motion for Final Judgment** (Doc. 26) be **GRANTED** and that

**Plaintiff's Amended Motion for Judgment on the Record** (Doc. 27) be **DENIED**.  I

recommend further that judgment affirming the administrative decision to deny benefits be

entered.

Respectfully submitted this
16th day of March 2011.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE


## <u>NOTICE TO PARTIES</u>

Failure to file written objections to the proposed findings and recommendations

contained in this report within fourteen (14) days from the date of its service shall bar an

aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a

district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R.

Civ. P. 6; M.D. Fla. R. 4.20.


Copies furnished to:
The Honorable James S. Moody, Jr., United States District Judge
Counsel of Record